## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Mary Baron, Calhea Johnson, Malika McLean and Tony Watson, individually and on behalf of all others similarly situated, | CASE NO. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | |
| Amazon Inc., a Delaware corporation, | |
| Defendant. | |

Plaintiff Mary Baron ("Plaintiff Baron"), Plaintiff Calhea Johnson ("Plaintiff Johnson"), Plaintiff Malika McLean ("Plaintiff McLean") and Plaintiff Tony Watson ("Plaintiff Watson," together with Plaintiffs Baron, Plaintiff Johnson and Plaintiff McLean "Plaintiffs"), by their attorneys allege upon information and belief, except for allegations pertaining specifically to Plaintiffs, which are based on personal knowledge:

### INTRODUCTION

1.      Amazon.com, Inc. ("Defendant" or "Amazon") is the largest American online retailer with an annual revenue of $386 billion for the year ended December 31, 2020.

2.      Among its myriad services, Amazon provides consumers the option to "Buy" movies ("Movie Content"), television or cable shows ("Show Content"), and music ("Music Content," together with Movie Content and Show Content, "Digital Content") for a fee via its website, www.amazon.com, and its "Prime Video app" (together with its website, the "Amazon Platform").  Some Movie Content is also available for "Rent."

3.      Consumers can purchase the Digital Content by clicking on a "Buy" button.  Once bought, the Movie Content and Show Content is housed in a folder called "Video Purchases &

1

Rentals" (the "Purchased Folder").  Purchased Music Content is housed in a folder called "Music Library."

4.      Except for content owned outright, Digital Content sold by Defendant is actually licensed to Amazon by the Digital Content's owner.  These licensing arrangements mean that, unlike in a true sale, Defendant can never pass title of any licensed Digital Content it claims to be selling consumers.  Thus, when a licensing agreement terminates for whatever reason, Defendant is required to pull the Digital Content from the consumers' Purchased Folder and Music Library, which it does without prior warning, and without providing any type of refund or remuneration to consumers.

5.      In other words, unlike a Best Buy or Target store that obtains title from a Digital Content's owner that it then conveys to a purchaser for value, Defendant's licensing arrangements prevent it from ever being able to pass title to Digital Content it claims it "sells" to consumers. Moreover, Defendant's sale of Digital Content, which it does not actually own, is made more egregious because, as demonstrated below, Amazon charges just as much for that content, at times even more so, than stores that actually transfer title of the Digital Content to its customers, which access can never be revoked.

6.      Accordingly, Defendant has been, and continues to, mislead consumers into believing it is selling them Digital Content, even though it is merely providing them with a license to view it, which can be terminated at any time, for any reason and without any type of warning so that a consumer can take steps to attempt to preserve it.

7.      Defendant likely misrepresents the true nature of its Digital Content transactions as a "sale" for one reason: if it called the transaction what it really is, some type of sublicensing arrangement, it could not charge nearly as much as it charges for the Digital Content by misrepresenting to consumers that it is a true sale.  Thus, it is no wonder that Defendant's product and digital media sales for the year ended December 31, 2020 were over $197 billion.

8.      Defendant's material misrepresentations relating to its "sale" of Digital Content has

caused Plaintiffs and the Class (as defined below) members to sustain damages by overpayment of Digital Content they can never own because Defendant does not have the right to transfer title to it in the first place.

## JURISDICTION AND VENUE

9.      Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

10.     Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]"

11.     The aggregate amount in controversy is at least $5,000,000.

12.     Minimal diversity is met because Plaintiffs are citizens of New York and Defendant is a citizen of Washington.

13.     Venue is proper because Plaintiff Baron and Plaintiff McLean, and many Class members, reside in this District and Defendant does business in this District and State.

14.     A substantial part of events and omissions giving rise to the claims occurred in this District.

15.     This court has personal jurisdiction over Defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

## CLASS ACTION ALLEGATIONS

16.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

17.     The proposed class is defined as:

All persons who purchased Digital Content from Defendant within

3

the State of New York during the applicable statute of limitations
and through class certification and trial (the "Class").

18.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class
before the Court determines whether certification is appropriate.

19.     Excluded from the Class are: governmental entities; Defendant; any entity in which
Defendant has a controlling interest; Defendant's officers, directors, affiliates, legal
representatives, employees, co-conspirators, successors, subsidiaries, and assigns; and, any judge,
justice, or judicial officer presiding over this matter and the members of their immediate families
and judicial staff.

20.     The members of the Class are so numerous that joinder is impractical.  The Class
consists of thousands of members, the identity of whom is within the knowledge of and can be
ascertained only by resort to Defendant's records.

21.     Plaintiffs' claims are typical of the claims of the Class in that they, like all Class
members, overpaid for the Digital Content.

22.     Plaintiffs, like all Class members, have been damaged by Defendant's misconduct
in that they overpaid for Digital Content.  Furthermore, the factual basis of Defendant's
misconduct is common to all Class members, and represents a common thread of unfair and
unconscionable conduct resulting in injury to all members of the Class.

23.     There are numerous questions of law and fact common to the Class and those
common questions predominate over any questions affecting only individual Class members.

24.     Among the questions of law and fact common to the Class are whether Defendant:

a.      Deceived consumers by misrepresenting that it was selling them Digital
        Content when, in fact, it was really only licensing it to them;

b.      Overcharged consumers for Digital Content it purported to sell them
        when, in fact, it was really only licensing it to them;

4

b.     Breached the covenant of good faith and fair dealing by overcharging consumers for Digital Content it purported to sell them when, in fact, it was really only licensing it to them;

c.     Violated New York consumer protection law; and

d.     Whether Plaintiffs and the Class were damaged by Defendant's conduct and, if so, the proper measure of damages.

25.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against large retail institutions like Defendants.   Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

26.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Defendant's misconduct will proceed without remedy.   Moreover, given that the "sale" of Digital Content was carried out in a uniform manner, common issues predominate over any questions, to the extent there are any, affecting only individual members.

27.     Even if the Class members themselves could afford such individual litigation, the court system could not.   Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings.

5

By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## PARTIES

28.     Plaintiff Baron is a citizen of Bronx, New York in Bronx County.

29.     During the relevant statutes of limitations, Plaintiff Baron purchased Show Content within this District and/or State for personal consumption and/or use in reliance on the representations that the Show Content was being sold to her, even though Defendant did not have the right to do so because Defendant was only legally able to sublicense it. Moreover, while not legally required to establish that Plaintiff Baron suffered an injury when she overpaid for the purchase of content she could never legally own, Plaintiff nevertheless lost Show Content Defendant misrepresented it sold her, including multiple episodes of the television show *Friends* (Bright/Kauffman/Crane Productions & Warner Bros. Television 2004-2006).

30.     Plaintiff Johnson is a citizen of Endicott, New York in Broome County.

31.     During the relevant statutes of limitations, Plaintiff Johnson purchased Movie Content within this State for personal consumption and/or use in reliance on the representations that the Movie Content was being sold to her, even though Defendant did not have the right to do so because Defendant was only legally able to sublicense it. Moreover, while not legally required to establish that Plaintiff Johnson suffered an injury when she overpaid for the purchase of content she could never legally own, Plaintiff nevertheless lost Movie Content Defendant misrepresented it sold her, including THE HATE YOU GIVE (Fox 2000 Pictures, et al. 2018) and THE INEVITABLE DEFEAT OF MISTER AND PETE (Venture Forth 2013).

32.     Plaintiff McLean is a citizen of Bronx, New York in Bronx County.

33.     During the relevant statutes of limitations, Plaintiff McLean purchased Movie

6

Content within this District and/or State for personal consumption and/or use in reliance on the representations that the Movie Content was being sold to her, even though Defendant did not have the right to do so because Defendant was only legally able to sublicense it.  Moreover, while not legally required to establish that Plaintiff McLean suffered an injury when she overpaid for the purchase of content she could never legally own, Plaintiff McLean nevertheless lost Movie Content Defendant misrepresented it sold her, including DISTURBIA (Paramount Pictures 2007) and TRANSFORMERS (DreamWorks Pictures et al. 2007).

34.     Plaintiff Walton is a citizen of Adams, New York in Jefferson County.

35.     During the relevant statutes of limitations, Plaintiff Walton purchased Movie Content and Show Content within this State for personal consumption and/or use in reliance on the representations that said content was being sold to him, even though Defendant did not have the right to do so because Defendant was only legally able to sublicense it.  Moreover, while not legally required to establish that Plaintiff suffered an injury when he overpaid for the purchase of content he could never legally own, Plaintiff nevertheless lost Movie Content Defendant misrepresented it sold him, including the movies ELF (New Line Cinema 2003) and TRANSFORMERS (DreamWorks Pictures et al. 2007).  Plaintiff also lost Show Content Defendant misrepresented it sold him, including *Billions* (Best Available! 2016-present).

36.     Defendant is a Delaware corporation with its principal place of business in Seattle, Washington, in King County, and is a citizen of Washington State.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

37.     Through the Amazon Platform, consumers can "Buy" or "Rent" Movie Content, and subsequently access it, in a variety of ways via computer, television, Amazon devices, mobile devices, Blu-ray players, games consoles and streaming media devices.  Consumers can also buy Show Content and Music Content.

38.     In the event that a consumer desires to "Rent" Movie Content, Defendant advertises

that, for a fee of around $5.99, the consumer will have access to the Movie Content for 30 days and then for 48 hours after the consumer first starts to watch the Movie Content.

39.    For a much higher fee of around $19.99, Defendant offers the option to "Buy" the Movie Content.

40.    Below is a representative example of the options available to a consumer on Defendant's website at the digital point-of-sale of Movie Content:



41.    In the event that a consumer desires to "Buy" Show Content, Defendant will sell it for a fee of around $2.99 per episode.

42.    For a much higher fee of around $19.99, Defendant offers the option to "Buy" an entire season of Show Content.

43.    Below is a representative example of the options available to a consumer on Defendant's website at the digital point-of-sale of Show Content:



44.     When a consumer chooses the option to "Buy" on the page of the Movie Content and Show Content by clicking on the "Buy" button, the Movie Content and Show Content instantly becomes available in the consumer's Purchased Folder without the consumer needing to accept any terms and conditions pursuant to a clickwrap agreement.

45.     Regardless of which device is used to access Movie Content and Show Content, or whether it is purchased via Defendant's website or the Prime Video app, the content is put into a folder called "Video Purchases & Rentals," as shown below.  Purchased Music Content is stored in the "Music Library."

46.    Clicking on the "Video Purchases & Rentals" link will take consumers to their Movie Content and Show Content purchases and rentals.  Clicking on the "Music Library" link will take consumers to their Music Content purchases.

47.    Below is a representative example of the options available to a consumer on Defendant's website at the digital point-of-sale of Music Content:



48.     As called out by the red arrow, consumers can "Buy" one digital song for $1.69. As called out by the green arrow, Defendant states that said song is "Sold by Amazon.com Services LLC" versus some other seller or the content's true owner.

49.     Reasonable consumers will expect that Defendant is using the words "Buy" and "Purchases" throughout the Amazon Platform in the same manner as those words are used, and understood, by the hundreds of millions of people throughout the world that speak English; that is, to "Buy" means to acquire possession over something,[1] and once the "Buy" transaction has been completed, that "something" is then considered to be a "Purchase."[2]

50.     Sold,[3] which is used in the language that appears at the digital point-of-sale of Music Content, is the past tense and past participle of "sell." Sell is defined as giving up property for money.[4]

51.     Moreover, after a product is the result of a "Purchase," no seller of it should be able

---

[1] Buy Definition, merriam-webster.com/dictionary/buy (last visited Nov. 19, 2021).
[2] Purchase Definition, merriam-webster.com/dictionary/purchase (last visited Nov. 19, 2021). ("to obtain by paying money or its equivalent").
[3] Sold Definition, https://www.merriam-webster.com/dictionary/sold (last visited Nov. 19, 2021).
[4] Sell Definition, https://www.merriam-webster.com/dictionary/sell (" to give up (property) to another for something of value (such as money)" (last visited Nov. 19, 2021).

to revoke a purchaser's access to it.  In other words, just like Best Buy or Target cannot come into a person's home to repossess a movie or show DVD, or a music CD sold by it, Defendant should not be able to remove Digital Content from its customers' Purchased Folder and Music Library.

52.     Unfortunately for those consumers who chose the "Buy" option, this is deceptive and untrue.  Rather, the ugly truth is that Defendant does not own most of the Digital Content it purports to sell.  In fact, a large portion of the Digital Content Amazon "sells" consumers on a daily basis is actually owned by others who license it to Defendant, thereby making Amazon a sublicensor of Digital Content versus a reseller.

53.     To make matters worse, Defendant charges as much money, even more so at times, for Digital Content it is merely sublicensing versus resellers (like Best Buy and Target) who are actually passing title to such property forever.  In fact, as shown below, Defendant is still "selling" a movie that is two years old, Star Wars: The Rise of Skywalker, for $19.99, while Target is selling that same movie, which a consumer truly owns and can keep forever, for only $10.00.



Star Wars: The Rise of Skywalker on Amazon Platform for $19.99



Star Wars: The Rise of Skywalker Target Price of $10.00

54.     Despite charging a price that is commensurate with a true sale of property, once Defendant's licensing agreement with a content owner terminates, Amazon must revoke the consumers' access and use of the Digital Content.  Amazon has done so on numerous occasions, without notice to consumers before or after the fact, leaving consumers without the ability to enjoy Digital Content they were led to believe they owned.  Incredibly, Amazon has routinely refused to refund consumers any monies paid to "Buy" Digital Content that it had to revoke because Amazon was only allowed to sublicense that content and that licensing agreement had been terminated.

55.     Defendant's representations are misleading because all of its actions relating to the purported sale of Digital Content give the impression that such content is purchased – *i.e.* the person owns it – when in fact that is not true because Defendant is only allowed to sublicense it.

56.     In so representing the "Purchase" of Digital Content as true ownership of the content, Defendant took advantage of the (1) cognitive shortcuts made at the point-of-sale, *e.g.* the use of the word "Rent" versus "Buy" and (2) price of the Digital Content, which is akin to an outright purchase versus a rental or some other type of licensing or lease arrangement.  Defendant's deception is further reinforced by its use of the words "Purchased" and "Sold" on the Amazon Platform.

57.     Though some consumers may get lucky and never lose access to any of their paid-for media, others may one day find that their Digital Content is now gone forever.  Regardless, all consumers have overpaid for the Digital Content because they are not in fact owners of it as represented by Defendant, despite having paid the amount of consideration typically tendered to "Buy" the product, because Defendant is only legally allow to sublicense the product.

58.     Defendant's representations that consumers are truly purchasing Digital Content are designed to – and do – deceive, mislead and defraud consumers.  A real-life experience listed on a Reddit post explains the disappearing Digital Content issue:



59.     The above complaint is not new news for Defendant.  Indeed, Defendant has been

aware for close to a decade that consumers are routinely misled by the manner in which it "sells" Digital Content.

**60.** A Consumer Reports article from October 16, 2012 titled <u>That Amazon Video You Bought? You May Not Actually Be Able To Watch It</u> (*available at* https://www.consumerreports.org/consumerist/that-amazon-video-you-bought-you-may-not-actually-be-able-to-watch-it/) discusses Defendant's unfair ability to pull "Purchased Digital Content" at any time: "This restriction isn't mentioned on the purchase page of the movie, nor is the customer given any such warning during the buying process. It's not even directly mentioned on the "Amazon Instant Video Usage Rules" page."  The article goes on to say that, "We've written Amazon to ask why they do not make this restriction more clear during the purchasing process. If the company replies — we're not holding our breath on this one — we will update."  Apparently, Defendant never replied because the article was never updated to reflect that.

61.     Defendant has sold more Digital Content, and at substantially higher prices per unit, than it would have in the absence of this misconduct, resulting in additional profits at the expense of deceived consumers.

62.     The consumers' belief that they truly own the Digital Content has a material bearing on price, or consumer acceptance of Defendant's Digital Content delivery services, because consumers are willing to pay substantially more for Digital Content that they believe they can access at any time and for an indefinite period.

63.     The value of the Digital Content that Plaintiffs and the Class members purchased and consumed was materially less than its value as represented by Defendant.

64.     Had Plaintiffs and the Class members known the truth, they would not have bought the Digital Content from Defendant or would have paid substantially less for it.

65.     As a result of the false and misleading representations, the Digital Content is sold at a premium price, compared to other similar Digital Content and services represented in a non-misleading way.

## CLAIMS

### FIRST CLAIM

### VIOLATION OF NEW YORK GBL § 349
**(On Behalf of Plaintiffs and the Class members)**

66.     Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

67.     New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . . ."

68.     Defendant's conduct alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiffs and the Class members seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendant, enjoining it from inaccurately describing, labeling, marketing, and promoting Digital Content.

69.     Defendant misleadingly, inaccurately, and deceptively represented that the Digital Content it sold to Plaintiffs and the Class members had been "Purchased" and, as such, that it would be available for viewing and/or listening indefinitely, when in fact Defendant knew that the Digital Content could become unavailable due to licensing restrictions imposed by content creators and/or owners or other reasons.

70.     Defendant's improper consumer-oriented conduct—including the labeling and advertising of the Digital Content —is misleading in a material way in that it, *inter alia*, induced Plaintiffs and the Class members to purchase and pay a premium for the Digital Content and to purchase the Digital Content when they otherwise would not have had they known they were merely obtaining a license to said content, which could be terminated at any time for any reason without prior warning.

71.     Defendant made the untrue or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

72.     Plaintiffs and the Class members have been injured inasmuch as they paid a premium for Digital Content contrary to Defendant's representations.   Accordingly, Plaintiffs and the Class members received less than what they bargained or paid for.

73.     Defendant's advertising and products' packaging and labeling induced Plaintiffs and the Class members to buy the Digital Content and to pay a premium price for it.

74.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of GBL §349(a) and Plaintiffs and the Class have been damaged thereby.

75.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiffs and the Class members are entitled to monetary and compensatory damages, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, as well as interest on those amounts, and attorneys' fees and costs.

76.     Plaintiffs and the Class members seek statutory damages under GBL § 349 of $50 per unit purchased.

77.     Plaintiffs, on behalf of the Class members, request that the Court enjoin Defendant from continuing to employ the unlawful acts and practices alleged herein.  If the Court does not restrain Defendant from engaging in these acts and practices in the future, Plaintiffs and the Class members will be harmed in that they will continue to believe they are buying Digital Content for viewing and/or listening indefinitely when, in fact, the Digital Content can be made unavailable at any time because it is merely being licensed to them.

**SECOND CLAIM**
**VIOLATION OF NEW YORK GBL § 350**
**(On Behalf of Plaintiffs and the Class members)**

78.     Plaintiffs repeat and reallege each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

79.     N.Y. Gen. Bus. Law § 350 ("GBL § 350") provides, in part, as follows:

> False advertising in the conduct of any business, trade or commerce or
> in the furnishing of any service in this state is hereby declared unlawful.

80.    GBL § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the
> kind, character, terms or conditions of any employment opportunity if
> such advertising is misleading in a material respect. In determining
> whether any advertising is misleading, there shall be taken into account
> (among other things) not only representations made by statement, word,
> design, device, sound or any combination thereof, but also the extent to
> which the advertising fails to reveal facts material in the light of such
> representations with respect to the commodity or employment to which
> the advertising relates under the conditions proscribed in said
> advertisement, or under such conditions as are customary or usual . . . .

81.    Defendant's labeling and advertisements contain untrue and materially misleading statements concerning its purported sale of Digital Content.

82.    Plaintiffs and the Class members have been injured inasmuch as they relied upon the labeling, packaging and advertising, and because of that paid a premium for Digital Content. Accordingly, Plaintiffs and the Class members received less than what they bargained or paid for.

83.    Defendant's advertising, packaging and product labeling induced Plaintiffs and the Class members to buy the Digital Content.

84.    Defendant made the untrue and misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

85.    Defendant violated GBL § 350 by representing that the Digital Content it sold to Plaintiffs and the Class members had been "Purchased" and, as such, that it would be available for viewing and/or listening indefinitely, when in fact Defendant knew that the Digital Content could become unavailable due to licensing restrictions imposed by content creators and/or owners or other reasons.

86.    Defendant's conduct constitutes multiple, separate violations of GBL § 350.

18

87.     Defendant made the material misrepresentations described in this Complaint in Defendant's advertising, and on the Amazon Platform where the Digital Content is purchased and stored.

88.     Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Digital Content were and continue to be exposed to Defendant's material misrepresentations.

89.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiffs and the Class members are entitled to monetary and compensatory damages, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, as well as interest on those amounts, and attorneys' fees and costs.

90.     Plaintiffs and the Class members seek statutory damages under GBL § 350 of $500 per unit purchased.

91.     Plaintiffs, on behalf of the Class members, request that the Court enjoin Defendant from continuing to employ the unlawful acts and practices alleged herein.  If the Court does not restrain Defendant from engaging in these acts and practices in the future, Plaintiffs and the Class members will be harmed in that they will continue to believe they are buying Digital Content for viewing and/or listening indefinitely when, in fact, the Digital Content can be made unavailable at any time.

## THIRD CLAIM
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class members in the Alternative)

73.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.      Plaintiffs, on behalf of themselves and the Class members, bring a claim for unjust enrichment.

75.      Defendant's conduct violated, *inter alia*, state and federal law by advertising,

marketing, and selling the Digital Content while misrepresenting and omitting material facts.

76.     Defendant's unlawful conduct as described in this Complaint allowed Defendant to knowingly realize substantial revenues from selling the Digital Content at the expense of, and to the detriment or impoverishment of, Plaintiffs and the Class members, and to Defendant's benefit and enrichment.  Defendant has thereby violated fundamental principles of justice, equity and good conscience.

77.     Plaintiffs and the Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Digital Content, which was not as Defendant represented it to be.

78.     Under New York's common law principles of unjust enrichment, it is inequitable for Defendant to retain the benefits conferred by Plaintiffs' and the Class members' overpayments.

79.     Plaintiffs and the Class members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and the Class members may seek restitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Class, respectfully request the Court to enter an Order:

A.     certifying the proposed Class under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as set forth above;

B.     declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C.     declaring that Defendant has committed the violations of law alleged herein;

D.     providing for any and all injunctive relief the Court deems appropriate;

E.      awarding monetary damages, including but not limited to any statutory, compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

F.      providing for any and all equitable monetary relief the Court deems appropriate;

G.      awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

H.      awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees;

I.      awarding pre- and post-judgment interest to the extent the law allows; and

J.      providing such further relief as this Court may deem just and proper.


November 19, 2021

Respectfully submitted,

                                        **REESE LLP**

                                        */s/ Carlos F. Ramirez*
                                        Michael R. Reese
                                        *mreese@reesellp.com*
                                        Carlos F. Ramirez
                                        *cramirez@reesellp.com*
                                        Charles D. Moore
                                        *cmoore@reesellp.com*
                                            (*Pro hac vice* to be submitted)
                                        100 West 93rd Street, 16th Floor
                                        New York, New York 10025-7524
                                        Telephone: (212) 643-0500
                                        Facsimile: (212) 253-4272

                                        **REESE LLP**
                                        George V. Granade
                                        *ggranade@reesellp.com*
                                        8484 Wilshire Boulevard, Suite 515
                                        Los Angeles, California 90211
                                        Telephone: (310) 393-0070
                                        Facsimile: (212) 253-4272

**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
*spencer@spencersheehan.com*
505 Northern Boulevard, Suite 311
Great Neck, New York 11021
Telephone:  (516) 303-0552
Facsimile: (516) 234-7800

*Counsel for Plaintiffs and the Proposed Class*